IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:10-CV-29-D

ROC F. SANSOTTA, Trustee         )
and Executor for the Estate of   )
Father Joseph Klaus, et al.,     )
                                 )
                Plaintiffs,      )
                                 )
        v.                       )      **ORDER**
                                 )
TOWN OF NAGS HEAD,               )
                                 )
                Defendant.       )

The Town of Nags Head ("Town" or "defendant") removed this case from Superior Court of Dare County, North Carolina ("Dare County Superior Court"), based on federal question jurisdiction. The case includes five federal claims, nine state-law claims, and four state-law counterclaims. For reasons explained below, the court grants summary judgment to the Town as to four of the federal claims and dismisses the fifth federal claim as unripe. The court remands the remaining state-law claims and counterclaims to Dare County Superior Court.

I.

This action concerns the Town's efforts to remove six oceanfront cottages located on Seagull Drive, Nags Head, North Carolina (the "Cottages"). Ralph and Gloria Tomita, Carole Shackelford, James Bergman, Linda Atsus, George Rusin, and the estate of Joseph Klaus (collectively "plaintiffs") own the Cottages. 2d Am. Compl. [D.E. 45] ¶¶ 1–12. Roc F. Sansotta ("Sansotta") manages the Cottages on plaintiffs' behalf, and has partial ownership interests in five of the Cottages. Sansotta Aff. [D.E. 76-2] ¶¶ 2–4; Sansotta Dep. 20–37. Over the years, natural forces have gradually eroded the beach that once separated plaintiffs' Cottages from the Atlantic Ocean. See Ogburn Aff. [D.E. 85-2] ¶ 10; Def.'s Resp. to Interrog. [D.E. 79-4] ¶ 6. The beach's vegetation

line is on the landward side of the Cottages. For nearly a decade, Sansotta has buffered the Cottages with sandbags to protect the Cottages from the ocean. See Sansotta Dep. 106–08, 148–49. Sansotta has also taken other measures to protect the Cottages from storm damage, such as making structural enhancements and strategically placing additional sand around the Cottages. See Sansotta Dep. 146–47; Sansotta Aff. ¶¶ 6–10.

On November 12, 2009, a storm struck Nags Head (the "November Storm"). See Sansotta Aff. ¶¶ 10, 12. In anticipation of the November Storm, Sansotta hired contractors Wilmer Harper ("Harper") and Michael Riddick ("Riddick") to protect the Cottages by moving sand around the Cottages. See Sansotta Dep. 165–61, 171–72; Harper 1st Dep. 132; Harper 2d Dep. 53–54; Riddick Dep. 65–66. Harper arrived at the Cottages and began moving sand sometime between 6:15 and 6:45 a.m. on November 12, 2009. Harper 1st Dep. 310; Harper 2d Dep. 52–54. At approximately 10:00 a.m., Riddick arrived to assist Harper. Riddick Dep. 67; Harper 1st Dep. 320. Harper and Riddick used heavy equipment, including a bulldozer, to move sand around the Cottages. Riddick Dep. 71–72; Harper 2d Dep. 73.

During the November Storm, the ocean breached Seagull Drive and washed out part of the roadway. Barile Dep. 49–51; Osborne Dep. 72–73; Brinkley Dep. 148. This caused a hole to develop in Seagull Drive. See Harper 2d Dep. 85–86, 111; Riddick Dep. 90; Sansotta Dep. 206; Barile Dep. 45–51; Osborne Dep. 72–73; Brinkley Dep. 145–149. Town officials first observed the hole at approximately 6:30 a.m. on November 12, 2009. Barile Dep. 45–51. The November Storm also washed water and debris across Seagull Drive. Barile Dep. 49–50; Brinkley Dep. 145, 168, 175. As a result, the Town erected a barricade across Seagull Drive during the morning of November 12, 2009, sometime between 7:00 a.m. and 9:00 a.m. See Harper 1st Dep. 310–12; cf. Riddick Dep. 67. The Town did so because it considered Seagull Drive unsafe, and did not want individuals on the roadway. See Ogburn Dep. 54–57; Wilson Dep. 110–112; cf. Barile 45–46.

2

Despite the barricade, Harper and Riddick continued to work on Seagull Drive, moving sand around the Cottages. See Riddick Dep. 67–72; Harper 1st Dep. 132, 320–21; Wilson Dep. 90; Osborne Dep. 88–89; Brinkley Dep. 145–148. At one point, Riddick and Harper filled the hole in Seagull Drive with sand and debris. See Riddick Dep. 90; Brinkley Dep. 145–48, 174–75, 210. At approximately 2:00 p.m. on November 12, 2009, the Town's staff met. Wilson Dep. 90. At the meeting, Town officials, including police chief Kevin Brinkley ("Chief Brinkley"), learned that people were working behind the Seagull Drive barricade. See Wilson Dep. 110–112; Osborne Dep. 136–38; Brinkley Dep. 117.

At approximately 3:00 p.m., Chief Brinkley and additional law enforcement officers arrived at the Cottages. Sansotta Aff. ¶¶ 53–54; Brinkley Dep. 134–39; see Sansotta Dep. 202–03. Chief Brinkley observed Harper and Riddick working on Seagull Drive, behind the barricade. See Brinkley Dep. 145–47. Chief Brinkley yelled to Riddick, asking who had moved the barricade. Brinkley Dep. 173–74; see also Riddick Dep. 139–40. Riddick pointed to Harper, and Chief Brinkley motioned for Harper to approach. Brinkley Dep. 173–176; cf. Harper 2d Dep. 118–19. Chief Brinkley told Harper that Seagull Drive was unsafe and that it was not safe for Harper to work behind the barricade. Brinkley Dep. 176–79. Chief Brinkley requested that Harper move to the other side of the barricade. Brinkley Dep. 183; Harper 2d Dep. 119–20, 123; see Sansotta Dep. 199, 226–27; Riddick Dep. 142. After speaking with Chief Brinkley, Harper called Sansotta, who happened to be en route to Seagull Drive. Cf. Sansotta Dep. 200–01; Harper Dep. 129–30. When Sansotta arrived, Harper informed Sansotta of Chief Brinkley's instructions. Sansotta Dep. 201–02. Sansotta did not speak with Chief Brinkley. Sansotta Dep. 201. Harper and Riddick stopped working and moved their equipment to the other side of the barricade. Harper Dep. 120–21, 123–24, 137; Riddick Dep. 142–47; Sansotta Dep. 226–27; Sansotta Aff. ¶ 56–59.

On November 30, 2009, the Town issued a declaration of nuisance ("Nuisance Declaration"), an order of abatement, and a warning citation to plaintiffs. Ogburn Dep. 152–54, Ex. 98; 2d Am.

3

Compl. Ex. B. The Nuisance Declaration informed plaintiffs that the Cottages created a "likelihood of personal and property injury" and were located in the "public trust,"[1] in violation of Town Ordinance § 16-31(6)(b) and (c) ("Ordinance 16-31(6)").[2] 2d Am. Compl. Ex. B. The Town instructed plaintiffs to demolish the Cottages within eighteen days or face daily $100 fines. Id. The Town warned plaintiffs that it would take action to demolish the Cottages if plaintiffs refused to comply. Id. On January 27, 2010, the Town began assessing a civil penalty of $100 per day per Cottage. Ogburn Dep. 174–76; Oakes Dep. 173–74.

## II.

On May 20, 2010, plaintiffs filed suit in Dare County Superior Court against the Town and the Town Manager, Timothy Wilson ("Wilson") [D.E. 2, 2-1]. On June 15, 2010, the Town and Wilson filed notice of removal to this court based on a federal question [D.E. 1]. On June 24, 2010, Wilson filed an answer to plaintiffs' original complaint [D.E. 13].

---

[1] Although the parties dispute the legal definition of the "public trust," the term generally refers to the portion of North Carolina's ocean beaches that are reserved for the public's use and enjoyment. See N.C. Gen. Stat. § 77-20.

[2] Ordinance 16-31(6) reads:

Storm or erosion damaged structures and resulting debris. The existence of any of the following conditions associated with storm-damaged or erosion-damaged structures or their resultant debris shall constitute a public nuisance.

(a) Damaged structure in danger of collapsing;

(b) Damaged structure or debris from damaged structures where it can reasonably be determined that there is a likelihood of personal or property injury;

(c) Any structure, regardless of condition, or any debris from damaged structure which is located in whole or in part in a public trust area or public land.

Nags Head, N.C., Code § 16-31(6).

On July 20, 2010, plaintiffs amended their complaint [D.E. 14]. On August 10, 2010, Wilson filed an answer to plaintiffs' amended complaint [D.E. 23]. On August 19, 2010, the Town moved to dismiss several of plaintiffs' claims [D.E. 24, 25]. On the same day, the Town filed an answer to plaintiffs' amended complaint and asserted counterclaims [D.E. 26]. On September 13, 2010, plaintiffs filed an answer to the Town's counterclaims [D.E. 30] and a response to the Town's motion to dismiss [D.E. 31]. The Town replied on September 27, 2010 [D.E. 33]. On September 30, 2010, the parties stipulated to Wilson's dismissal [D.E. 34].

On October 29, 2010, plaintiffs moved to file a second amended complaint [D.E. 39]. On December 7, 2010, the court granted plaintiffs' motion to file a second amended complaint and denied as moot the Town's motion to dismiss the claims in the first amended complaint [D.E. 44]. On December 8, 2010, plaintiffs filed a second amended complaint asserting fourteen claims [D.E. 45]:

> (1) Declaratory judgment that the Cottages are not in the "public trust area." 2d Am. Compl. ¶¶ 104–10.
>
> (2) Declaratory judgment that the enactment of Ordinance 16-31(6)(c) is beyond the Town's authority. Id. ¶¶ 111–18.
>
> (3) Declaratory judgment that the Town's actions violated N.C. Gen. Stat. §§ 160A-441 to -540. Id. ¶¶ 119–26.
>
> (4) Declaratory judgment that the Town lacks the authority to declare structures on the "dry sand beach" a nuisance. Id. ¶¶ 127–40.
>
> (5) Declaratory judgment that Ordinance 16-31(6)(c) does not include the "dry sand beach." Id. ¶¶ 141–49.
>
> (6) Declaratory judgment that the Town's action in restricting access to the Cottages during the November Storm was unlawful. Id. ¶¶ 150–64.
>
> (7) Declaratory judgment that the Town's actions deprived plaintiffs of their substantive due process rights as provided by the United States and North Carolina Constitutions. Id. ¶¶ 165–67.
>
> (8) Declaratory judgment that the Town's actions deprived plaintiffs of their procedural due process rights as provided by the United States and North Carolina Constitutions. Id. ¶¶ 168–70.

5

(9) Declaratory judgment that the Town's actions deprived plaintiffs of the equal protection under the law as provided by the United States and North Carolina Constitutions. Id. ¶¶ 171–82.

(10) The Town acted under color of state law to deprive plaintiffs of their rights secured by the Fifth and Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. § 1983. Id. ¶¶ 183–87.

(11) The Town's actions were a regulatory taking under the United States and North Carolina Constitutions. Id. ¶¶ 188–95.

(12) Initiation of an inverse condemnation proceeding against the Town. Id. ¶¶ 196–210.

(13) The Town was negligent in preventing Sansotta's team from accessing the Cottages during the November Storm and in inspecting the Cottages prior to issuing the Nuisance Declaration. Id. 211–26.

(14) Preliminary and permanent injunction of the Town's demolition of the Cottages, assessment of civil penalties, and any action that prevents plaintiffs from protecting the Cottages. Id. ¶¶ 227–34.

On January 14, 2011, the Town moved to dismiss, pursuant to Rule 12(b)(6), plaintiffs' third, seventh, eighth, ninth, tenth, and thirteenth claims in their entireties, and plaintiffs' sixth and eleventh claims in part [D.E. 48, 49]. On the same day, the Town filed an answer to plaintiffs' second amended complaint and asserted four counterclaims [D.E. 50]:

(1) An order of abatement pursuant to N.C. Gen. Stat. § 160A-175. Town's Countercl. [D.E. 50] ¶¶ 1–50.

(2) In the alternative, an order of abatement pursuant to section 160A-193. Id. ¶ 51–62.

(3) In the alternative, an order of abatement pursuant to the common law theory of public nuisance. Id. ¶¶ 63–68.

(4) Recovery of civil penalties pursuant to section 160A-175. Id. ¶¶ 69–74.

On January 31, 2011, plaintiffs filed a memorandum in opposition to the Town's motion to dismiss [D.E. 55]. Plaintiffs answered the Town's counterclaims on February 3, 2011 [D.E. 56]. On February 17, 2011, the Town replied to plaintiffs' memorandum in opposition to the Town's motion to dismiss [D.E. 58]. On March 4, 2011, plaintiffs filed a motion and supporting

6

memorandum to strike the Town's designation of David Owens as a rebuttal expert witness [D.E. 61, 62], to which the Town responded on March 21, 2011 [D.E. 63]. Plaintiffs then moved to appoint M. Douglas Styons, Jr., as a rebuttal expert witness on April 7, 2011 [D.E. 64, 65], to which the Town responded in opposition on April 20, 2011 [D.E. 67].

On August 4, 2011, plaintiffs moved for summary judgment as to ten of their claims (the second through eighth, and the tenth through twelfth) and all four of the Town's counterclaims [D.E. 75–79]. On August 5, 2011, the court denied the Town's motion to dismiss the claims in plaintiffs' second amended complaint [D.E. 80]. On August 15, 2011, the Town moved for summary judgment on all fourteen of plaintiffs' claims and the Town's first, third, and fourth counterclaims [D.E. 81, 85, 88, 95]. On the same day, the Town also filed a motion in limine to exclude certain lay opinion testimony regarding damage to plaintiffs' Cottages [D.E. 82–84, 86–87, 89–94, 96–105].

On September 2, 2011, the Town filed a memorandum and exhibits in opposition to plaintiffs' motion for partial summary judgment [D.E. 109–12]. On September 8, 2011, plaintiffs filed a memorandum and exhibits in opposition to the Town's motion in limine [D.E. 113–15]. On September 19, 2011, plaintiffs replied to the Town's memorandum in opposition to plaintiffs' motion for partial summary judgment [D.E. 118].

On September 19, 2011, plaintiffs requested that the court hold a status conference [D.E. 119]. Plaintiffs informed the court that a beach nourishment project had restored the beach sand in front of the Cottages and, as a result, the Town had partially withdrawn the Nuisance Declaration on September 14, 2011. See Pls.' Mot. Status Conf. [D.E. 119], Ex. A. Specifically, the Town had notified plaintiffs that the Cottages "no longer constitute[d] a violation of Town Code Sec. 16-31(6)(c)[,]" but that the Cottages "continue[d] to constitute a nuisance under Town Code Sec. 16-31(6)(b)" because of structural damage. Id. 1. The Town explained that even though the Cottages were "clearly still" in the public trust area, the Declaration had been partially lifted because the Cottages no longer impeded "use of and access to the ocean beach." Id. The Town invited plaintiffs

7

to apply for permits to repair the Cottages. Id.

On September 26, 2011, the Town replied to plaintiffs' memorandum in opposition to the Town's motion for partial summary judgment [D.E. 120, 121] and to plaintiffs' memorandum in opposition to the Town's motion in limine [D.E. 122, 123].

On October 7, 2011, the Town responded to plaintiffs' motion for a status conference [D.E. 124]. The Town asserted that even though it partially withdrew the Nuisance Declaration, the Town is still entitled to civil penalties for the period when the Declaration was in effect. Def.'s Resp. Pls.' Mot. Status Conf. [D.E. 124] 4. The Town no longer seeks demolition of the Cottages "unless and until" plaintiffs do not make the repairs necessary to abate the nuisance. Id. 5. The Town stated that it will continue to assess civil penalties until the repairs are made. Id.

On October 26, 2011, plaintiffs moved to strike Cliff Ogburn's affidavit [D.E. 126]. On November 17, 2011, the Town responded in opposition to plaintiffs' motion to strike [D.E. 127]. On November 22, 2011, plaintiffs replied [D.E. 131]. On February 23, 2012, plaintiffs supplemented their summary judgment filings by notifying the court of the North Carolina Court of Appeals's decision in Town of Nags Head v. Cherry, Inc., ___ N.C. App. ___, 2012 WL 540742 (2012) [D.E. 132]. In light of this decision, plaintiffs also requested leave to file a motion to dismiss the Town's counterclaims [D.E. 133]. The Town responded in opposition [D.E. 134], and plaintiffs replied [D.E. 135].

### III.

A district court has original subject matter jurisdiction over federal claims. See 28 U.S.C. § 1331. Plaintiffs' complaint, originally filed in state court, includes both state-law claims and federal claims. Thus, based on the court's original jurisdiction over the federal claims, the Town properly removed the case pursuant to 28 U.S.C. § 1441(a).

The court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367. Section 1367 confers supplemental jurisdiction over claims that are "so related to claims in

8

the action within [the court's] original jurisdiction that they form part of the same case or controversy . . . ." Id. § 1367(a). Even when supplemental jurisdiction exists, however, the court may decline to exercise such jurisdiction over state-law claims. Id. § 1367(c); e.g., Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir. 2001); Shanaghan v. Cahill, 58 F.3d 106, 109 (4th Cir 1995). Section 1367(c) describes several factors that inform a court's decision about whether to exercise supplemental jurisdiction over state-law claims. See 28 U.S.C. § 1367(c). A key factor is whether the federal claims are eliminated before trial. See id. § 1367(c)(3). Accordingly, the court first addresses the motions for summary judgment as to the federal claims. The court then evaluates whether to exercise supplemental jurisdiction over the state-law claims.

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). This same standard applies to cross-motions for summary judgment. See Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011). Each party's motion is analyzed separately under the Rule 56 standard. Id.; Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999). The parties agree that there are no genuine issues of material fact regarding the federal claims. See Def.'s Mot. Summ. J. 1; Pls.' Mot. Summ. J. 1; Pls.' Mem. Opp'n Def.'s Mot. Summ. J. 29.

A.

Plaintiffs seek a declaratory judgment that the Town's actions violated their substantive due process rights. 2d Am. Compl. ¶¶ 165–67. The parties have filed cross-motions for summary judgment on this claim. Def.'s Mot. Summ. J. 2; Pls.' Mot. Summ. J. 2.

To establish a substantive due process violation, plaintiffs must demonstrate "(1) that they had property or a property interest; (2) that the [Town] deprived them of this property or property interest; and (3) that the [Town]'s action [fell] so far beyond the outer limits of legitimate

9

governmental action that no process could cure the deficiency." Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 827 (4th Cir. 1995) (emphasis removed); see MLC Auto., LLC v. Town of S. Pines, 532 F.3d 269, 281 (4th Cir. 2008). The Town's conduct must have been "so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." Rucker v. Harford Cnty., Md., 946 F.2d 278, 281 (4th Cir. 1991); see Sylvia, 48 F.3d at 827; Love v. Pepersack, 47 F.3d 120, 123 (4th Cir. 1995). Here, even if the Town did deprive plaintiffs of a property interest, the Town is entitled to summary judgment because its actions were not "so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." Sylvia, 48 F.3d at 827.

In opposition to this conclusion, plaintiffs make three arguments. First, plaintiffs contend that the Town violated their substantive due process rights when Chief Brinkley "forcibly prevented [p]laintiffs' contractors from protecting the [Cottages] at the height of the November Storm." Pls.' Mem. Supp. Mot. Summ. J. 37. For this argument to succeed, plaintiffs must demonstrate that the Town's decision to close Seagull Drive and Chief Brinkley's enforcement of the closure were arbitrary and irrational actions. See Rucker, 946 F.2d at 281; Sylvia, 48 F.3d 827. "Irrationality and arbitrariness imply a most stringent standard against which state action is to be measured . . . ." Rucker, 946 F.2d at 281; see Sylvia, 48 F.3d at 828 ("[S]ubstantive due process . . . is intended only to prevent government from abusing [its] power, or employing it as an instrument of oppression." (quotations omitted) (alteration in original)); Hawkins v. Freeman, 195 F.3d 732, 738 (4th Cir. 1999) (en banc) (substantive due process is violated by action "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" (quotation omitted)). The evidence must clearly show that the Town's conduct "has no foundation in reason and [was] a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense." Adams v. Village of Wesley Chapel, 259 F.

10

App'x 545, 550 (4th Cir. 2007) (per curiam) (unpublished) (quotation omitted); Sylvia, 48 F.3d at 827; Frye v. Brunswick Cnty. Bd. of Educ., 612 F. Supp. 2d 694, 705 (E.D.N.C. 2009) (quotation omitted).

On November 12, 2009, the ocean breached Seagull Drive and a hole developed in the roadway. See Harper 2d Dep. 85–86, 111; Riddick Dep. 90; Sansotta Dep. 206; Barile Dep. 45–51; Osborne Dep. 72–73; Brinkley Dep. 145–149. Thus, the Town's decision to erect a barricade blocking access to Seagull Drive was substantially related to public safety and was not arbitrary or irrational. See, e.g., Green v. City of Raleigh, 523 F.3d 293, 303 (4th Cir. 2008) (recognizing significant governmental interest in traffic and safety); Sullivan v. City of Augusta, 511 F.3d 16, 37 (1st Cir. 2007) (recognizing the authority of "police and other officials" to close roads for public safety); Lytle v. Doyle, 326 F.3d 463, 470 (4th Cir. 2003) ("[I]t is uncontested that the State may act to protect its substantial and legitimate interest in traffic safety."); Edwards v. City of Santa Barbara, 150 F.3d 1213, 1216 (9th Cir. 1998) (per curiam) (recognizing governmental interest in "ensuring traffic safety"); Ater v. Armstrong, 961 F.2d 1224, 1229 (6th Cir. 1992) (recognizing roadway safety as a legitimate governmental interest); see also Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 756 (1985) ("States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." (quotations omitted)). Likewise, Chief Brinkley's instruction to Harper and Riddick—who, in the midst of the November Storm, disregarded the barricade and proceeded to work on a breached and damaged roadway, see Riddick Dep. 67–72, 90; Harper 1st Dep. 132, 320–21; Wilson Dep. 90; Osborne Dep. 88–89; Brinkley Dep. 145–148, 174–75, 210—was also substantially related to public safety, and was not arbitrary or irrational. See, e.g., Sullivan, 511 F.3d at 37; Lytle, 326 F.3d at 470.

Second, plaintiffs contend that the Town violated their substantive due process rights by issuing the Nuisance Declaration, which "ordered [the Cottages'] demolition at [p]laintiffs' expense, and assessed civil penalties to 'club' [p]laintiffs into complying with its demands." Pls.' Mem.

11

Supp. Mot. Summ. J. 37. The Town, however, cannot demolish the Cottages or collect the civil penalties without first obtaining a court order. See N.C. Gen. Stat. § 160A-175 (enforcement of ordinances). In fact, the Town has sought, through its four counterclaims, a court order to enforce the Nuisance Declaration. See Countercl. ¶¶ 1–74. Because of plaintiffs' pre-deprivation procedural protections, the Town's issuance of the Nuisance Declaration did not violate plaintiffs' substantive due process rights. See Sylvia, 48 F.3d at 827; Rucker, 946 F.2d at 281.

Third, plaintiffs posit that the Town violated their substantive due process rights by "prohibit[ing] [p]laintiffs from making any repairs" to the Cottages. Pls.' Mem. Supp. Mot. Summ. J. 37. Plaintiffs allege that after issuing the Nuisance Declaration, the Town refused to issue to plaintiffs building permits that were required to repair to the Cottages. 2d Am. Compl. ¶¶ 95, 178; see id., Ex. B ("No development permits will be issued for [the Cottages]."). To show that the Town's threatened denial of building permits violated plaintiffs' substantive due process rights, plaintiffs must first demonstrate that they had a property interest in such permits. See Henry v. Jefferson Cnty. Planning Comm'n, 34 F. App'x 92, 97 (4th Cir. 2002) (per curiam) (unpublished); Gardner v. City of Balt. Mayor & City Council, 969 F.2d 63, 68 (4th Cir. 1992); cf. Tri Cnty. Paving, Inc. v. Ashe Cnty., 281 F.3d 430, 440 (4th Cir. 2002).

Property interests "are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972); Tri Cnty. Paving, 281 F.3d at 436. As for building permits, "whether a property-holder possesses a legitimate claim of entitlement to a permit . . . turns on whether . . . the local agency lacks all discretion to deny issuance of the permit or to withhold its approval. Any significant discretion conferred upon the local agency defeats the claim of a property interest." Gardner, 969 F.2d at 68 (emphasis removed) (collecting cases); see Henry, 34 F. App'x at 97; Sylvia, 48 F.3d at 826; Love, 47 F.3d at 122–23; see also Roth, 408 U.S. at 577 ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.

12

He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."). Admittedly, the Town's Code does not appear to explicitly grant the building inspector discretion in issuing permits. See Nags Head, N.C., Code §§ 10-71 through -84. Yet, unlike some codes, the Town's code does not mandate the issuance of a building permit upon proper application. See Scott v. Greenville Cnty., 716 F.2d 1409, 1418–19 & n.10 (4th Cir. 1983); cf. Gardner, 969 F.2d at 68–69. In fact, the code implicitly recognizes the building inspector's discretion in issuing permits. See Nags Head, N.C., Code § 10-75 ("[i]f, in the opinion of the building inspector, the valuation . . . appears to be underestimated on the application, the permit shall be denied . . ."); id. § 10-76(a) (providing means for appeal "[w]henever the building inspector shall reject or refuse to approve" a permit application).[3] Plaintiffs cannot claim that they were deprived of a property interest if they were never entitled to building permits in the first place. See, e.g., Henry, 34 F. App'x at 97.

Furthermore, even if plaintiffs did have a property interest in building permits, plaintiffs have not demonstrated that the Town deprived them of such a property interest. Because plaintiffs have yet to apply for a permit, see Ogburn Aff. ¶ 25; Sansotta Dep. 140–45, 297–97, the Town has yet to withhold a permit from them.[4] Plaintiffs' "substantive due process rights have not been violated until, at the very least, [they have] been deprived of [their] property." Henry, 34 F. App'x at 97 (citing Sylvia, 48 F.3d at 827).

---

[3] North Carolina municipalities lack discretion to deny an applicant a permit when the application complies with all of an ordinance's requirements. See Application of Rea Const. Co., 272 N.C. 715, 718, 158 S.E.2d 887, 889–90 (1968); Mitchell v. Barfield, 232 N.C. 325, 327, 59 S.E.2d 810, 811 (1950); Quadrant Corp. v. City of Kinston, 22 N.C. App. 31, 32, 205 S.E.2d 324, 325 (1974). Notably, though, in each cited case, a municipality denied a permit on unauthorized or arbitrary grounds. See Rea Const., 272 N.C. at 716–17, 158 S.E.2d at 889; Mitchell, 232 N.C. at 327, 59 S.E.2d at 811; Quadrant Corp., 22 N.C. App. at 31–32, 205 S.E.2d at 324–25.

[4] The Town has issued permits to other beach house owners who have received identical nuisance declarations. Ogburn Aff. ¶ 25.

13

Alternatively, even if the Town did deprive plaintiffs of a property interest, the Town's conduct was not "so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of . . . adequate rectification by any post-deprivation state remedies." Rucker, 946 F.2d at 281; see Sylvia, 48 F.3d at 827; Love, 47 F.3d at 123. Ultimately, plaintiffs' substantive due process claim fails because plaintiffs have an adequate post-deprivation remedy. See Ruttenberg v. Jones, 283 F. App'x 121, 129 (4th Cir. 2008) (per curiam) (unpublished); Tri Cnty. Paving, 281 F.3d at 441; Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal, Va., 135 F.3d 275, 288 (4th Cir. 1998); Sylvia, 48 F.3d at 827; Love, 47 F.3d at 123. North Carolina's inverse condemnation proceeding is such an adequate post-deprivation remedy. See Yates v. Jamison, 782 F.2d 1182, 1184–85 (4th Cir. 1986). Not only is this post-deprivation remedy available to plaintiffs, but they are presently pursuing this remedy in claim twelve. Accordingly, the court grants the Town's motion for summary judgment as to plaintiffs' request for declaratory relief for a violation of plaintiffs' substantive due process rights.

B.

Plaintiffs also seek a declaratory judgment that the Town's actions violated their procedural due process rights. 2d Am. Compl. ¶¶ 168–70. The parties have filed cross-motions for summary judgment as to this claim. Pls.' Mot. Summ. J. 2; Def.'s Mot. Summ. J. 2.

To establish a procedural due process violation, plaintiffs must demonstrate "(1) a cognizable 'liberty' or 'property' interest; (2) the deprivation of that interest by 'some form of state action'; and (3) that the procedures employed were constitutionally inadequate." Iota Xi Chapter of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 146 (4th Cir. 2009); see Tri Cnty. Paving, 281 F.3d at 436; Sylvia, 48 F.3d at 826. A constitutionally adequate procedure is "merely a guarantee of fair procedures—typically notice and an opportunity to be heard." Wolf v. Fauquier Cnty. Bd. of Supervisors, 555 F.3d 311, 323 (4th Cir. 2009) (quotation omitted). Thus, "the fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful

14

manner' (usually prior to the deprivation of a protected interest)." Bogart v. Chapell, 396 F.3d 548, 556 (4th Cir. 2005) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)) (other quotations and citation omitted).

Plaintiffs first argue that the Town violated their procedural due process rights by failing to comply with the Minimum Housing Act's ("MHA"), N.C. Gen. Stat. §§ 160A-441 through -450, procedural requirements. Pls.' Mem. Supp. Mot. Summ. J. 36. The MHA authorizes municipalities to remove dwellings "unfit for human habitation" or otherwise "injurious to [public] health." See N.C. Gen. Stat. § 160A-441. The MHA imposes procedural requirements that a municipality must satisfy before repairing, closing, or demolishing a hazardous dwelling, such as providing the owner with notice, a hearing, and an opportunity to bring his dwelling up to code. See id. § 160A-443. Plaintiffs contend that because the Town did not act pursuant to the MHA, the Town necessarily violated plaintiffs' procedural due process rights.

Plaintiffs are wrong. In addition to their power under the MHA, North Carolina municipalities also have a separate power to define and abate nuisances, see id. § 160A-174, and municipalities can enforce a nuisance ordinance against real property by initiating a civil action. Id. § 160A-175(e). Here, the Town is acting under its nuisance authority, rather than the MHA. The Town has defined a "nuisance" as a "structure" that presents "a likelihood of personal or property injury" or that is "located in whole or in part in a public trust area or public land." Nags Head, N.C., Code § 16-31(6). The Town declared the Cottages to be "nuisances" because "there was 'a likelihood of personal or property injury' . . . and . . . the Cottages were located in whole or in part in Public Trust areas pursuant to Section 16-31 of the Code." 2d Am. Compl., Ex. B. The Town did not allege that the Cottages are "unfit for human habitation" or otherwise "injurious to [public] health," the bases for action under the MHA. See id. § 160A-441. Moreover, the Town filed counterclaims seeking a court order to enforce the Nuisance Declaration. See Countercl. ¶¶ 1–74.

15

Because the Town is acting pursuant to section 160A-175, the MHA's procedural requirements are irrelevant.

Nonetheless, the court still must determine whether section 160A-175's procedural safeguards are sufficient to satisfy plaintiffs' procedural due process rights. In Mathews v. Eldridge, 424 U.S. 319 (1976), the Supreme Court set forth a three-part inquiry to determine whether a government provided sufficient process. Id. at 335; see, e.g., Lovelace v. Lee, 472 F.3d 174, 202–03 (4th Cir. 2006); Capitol Mortg. Bankers, Inc. v. Cuomo, 222 F.3d 151, 155–56 (4th Cir. 2000). Mathews requires the court to consider the private interest affected by the Nuisance Declaration, the risk of an erroneous deprivation of that interest through the procedures used, as well as the probable value of additional safeguards, and the government's interest, including the administrative burden that additional procedural requirements would impose. 424 U.S. at 335; see Lovelace, 472 F.3d at 202; Cuomo, 222 F.3d at 156. Importantly, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.' Only after finding the deprivation of a protected interest [does the court] look to see if the State's procedures comport with due process." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999) (citations omitted); see Andrew v. Clark, 561 F.3d 261, 269 (4th Cir. 2009). Thus, the court first must determine whether the Town's issuance of the Nuisance Declaration deprived plaintiffs of a protected property interest.

The Nuisance Declaration did not deprive plaintiffs of physical access to the Cottages. Although enforcement of the Nuisance Declaration through the Cottages' demolition would cause a physical deprivation of plaintiffs' property interest, the Town cannot so enforce the Nuisance Declaration without first giving plaintiffs an opportunity to be heard via a civil action in state court. See N.C. Gen. Stat. § 160A-175(e). The Town initiated such an action by filing its counterclaims, see Countercl. ¶¶ 1–74, and plaintiffs have vigorously responded.

16

Notwithstanding the pending proceeding concerning the counterclaims, plaintiffs insist that the Town deprived them of property interests because issuing the Declaration prevented plaintiffs from repairing, renting, or selling the Cottages. See Pls.' Mem. Opp'n Def.'s Mot. Summ. J. 30. In support, plaintiffs note that governmental conduct less restrictive than a total or physical seizure of a property can deprive an owner of a property interest. Id.; see, e.g., Connecticut v. Doehr, 501 U.S. 1, 11–12; United States v. 408 Peyton Rd. S.W., Atlanta, Fulton Cnty., Ga., 162 F.3d 644, 649 (11th Cir. 1998) (en banc). In Doehr, the Supreme Court held that the attachment of a property affected "significant" property interests, and thus required that governments provide notice and a hearing prior to attachment. 501 U.S. at 11, 18. The Court noted that, though less than a "total deprivation," attachment "ordinarily clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause." Id. at 11. Thus, "the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection." Id. at 12.

Unfortunately for plaintiffs, not all encumbrances and impairments of property rights trigger due process protection. Specifically, a party can file a lis pendens without giving the property owner notice and an opportunity to be heard. Id. at 29 (Rehnquist, C.J., concurring); see United States v. James Daniel Good Real Prop., 510 U.S. 43, 58 (1993); United States v. Register, 182 F.3d 820, 837 (11th Cir. 1999); United States v. Real Prop. Known & Numbered as 429 S. Main St., 52 F.3d 1416, 1420 (6th Cir. 1995); see also Kirby Forest Indus., Inc. v. United States, 467 U.S. 13, 14–15 (1984) (holding that lis pendens does not rise to the level of a taking); Aronson v. City of Akron, 116 F.3d 804, 811 (6th Cir. 1997) (holding that a government may file a lien notice without conducting an antecedent hearing because a lien notice "has the same practical effect as the filing of a lis pendens notice"). A lis pendens notifies the public that a property is subject to pending litigation. Doehr, 501 U.S. at 29 (Rehnquist, C.J., concurring); Register, 182 F.3d at 836 & n.19. Accordingly, a lis

17

pendens impairs an owner's ability to sell or rent a property. Doehr, 501 U.S. at 29 (a lis pendens affects the "ability to alienate the property, or to obtain additional security on the basis of title to the property"); Register, 182 F.3d at 836 ("Admittedly notices of lis pendens have the practical effect of impeding an owner's ability to sell property, particularly at its (unrestricted) market value."). However, a lis pendens does not terminate an owner's right to dispose of a property—an owner is still "free to make whatever use is pleased of its property." Kirby, 467 U.S. at 15; see Register, 182 F.3d at 836–37 (recognizing that the owner retains the right to alienate the property); Aronson, 116 F.3d at 811 ("A lis pendens does not affect the use to which the property may be put during the pendency of the action . . . ."). Thus, before a government issues a lis pendens, an owner is not entitled to an antecedent hearing. See Doehr, 501 U.S. at 29 (Rehnquist, C.J., concurring); Good, 510 U.S. at 58–59; Register, 182 F.3d at 837; 429 S. Main St., 52 F.3d at 142; cf. United States v. TWP 17 R 4 Certain Real Prop. in Me., 970 F.2d 984, 990 (1st Cir. 1992) (an owner is not entitled to a hearing before a government posts an arrest warrant on the owner's property to provide notice of pending litigation).

The Nuisance Declaration is far more akin to a lis pendens than an attachment. The Nuisance Declaration simply provides notice of the Town's intent to seek judicial enforcement of the nuisance ordinances. See Doehr, 501 U.S. at 29 (Rehnquist, C.J., concurring); Register, 182 F.3d at 836 & n.19. Thus, despite plaintiffs' allegations, the Nuisance Declaration did not prevent plaintiffs from selling or renting the property. To the contrary, plaintiffs were "free to make whatever use [they] pleased of [their] property." Kirby, 467 U.S. at 15; see Register, 182 F.3d at 836–37; Aronson, 116 F.3d at 811. Although the Declaration may have diminished the Cottages' attractiveness, governmental action that depresses a property's market value does not constitute a deprivation of a property interest. See Doehr, 501 U.S. at 29 (Rehnquist, C.J., concurring); Register, 182 F.3d at 836. Because the Nuisance Declaration did not deprive plaintiffs of a property interest, the Town did not violate plaintiffs' procedural due process rights when it issued the Nuisance

18

Declaration without first giving plaintiffs notice and a hearing.

Alternatively, the Town did not violate plaintiffs' procedural due process rights because plaintiffs retain the option of pursuing an inverse condemnation proceeding. Procedural due process is satisfied when a party has access to an adequate post-deprivation remedy. See, e.g., Presley v. City of Charlottesville, 464 F.3d 480, 490 (4th Cir. 2006); Liberty Mut. Ins. Co. v. La. Dep't of Ins., 62 F.3d 115, 118 (5th Cir. 1995); Yates, 782 F.2d at 1184–85; Bennett v. Monette, 507 F. Supp. 2d. 514, 518 (E.D.N.C. 2007) (collecting cases). North Carolina's inverse condemnation proceeding is an adequate post-deprivation remedy, Yates, 782 F.2d at 1184–85, and one that plaintiffs are pursuing in claim twelve. Therefore, the court grants the Town's motion for summary judgment as to plaintiffs' request for a declaratory judgment that the Town violated plaintiffs' procedural due process rights.

C.

Additionally, plaintiffs request a declaratory judgment that the Town's actions deprived them of equal protection. 2d. Am. Compl. ¶¶ 171–82. The Town moves for summary judgment as to this claim. Def.'s Mot. Summ. J. 2. Plaintiffs oppose the Town's motion for summary judgment by arguing that the Town's "selective enforcement" of Ordinance 16-31(6) violated plaintiffs' equal protection rights. See Pls.' Mem. Opp'n Def.'s Mot. Summ. J. 31.[5]

"The equal protection guarantee of the Fourteenth Amendment does not take from the States all power of classification[,]" Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 271 (1979), but "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike," Nordlinger v. Hahn, 505 U.S. 1, 10 (1992); see also City of Cleburne, Tex. v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). Thus, "[t]o succeed on an equal protection

---

[5] In addition to opposing the Town's motion, plaintiffs ask the court to grant plaintiffs summary judgment on the ninth claim, despite not having moved for summary judgment on the claim themselves. See Pls.' Mem. Opp'n Def.'s Mot. Summ. J. 31.

19

claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001); see In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 471 (4th Cir. 1999); Sylvia, 48 F.3d at 818–19. "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Garraghty, 239 F.3d at 654. Unless the government differentiated based on a suspect classification, "a state regulation or policy will be presumed to be valid and will be sustained if the classification is rationally related to a legitimate state interest." Id.; see City of Cleburne, 473 U.S. at 440; Tri Cnty. Paving, 281 F.3d at 439.

Plaintiffs claim that the Town discriminated against them by requiring them to remain behind the barricade on Seagull Drive, while not enforcing similar roadway restrictions on other beachfront property owners. 2d. Am. Compl. ¶¶ 174–75. To prevail, plaintiffs must demonstrate that they were "treated differently from others with whom [they were] similarly situated." Garraghty, 239 F.3d at 654; see In re Long Term Admin. Segregation, 174 F.3d at 471; Sylvia, 48 F.3d at 818–19. The evidence, however, shows that plaintiffs and their agents were the only known individuals working on a closed Nags Head roadway during the November Storm. See Brinkley Dep. 240; Sansotta Dep. 230; cf. Osborne Dep. 114–16. Plaintiffs have provided no evidence supporting their allegation that the Town permitted other individuals to work on a closed roadway during the November Storm. Accordingly, there is no genuine dispute as to any material fact, and the court grants the Town summary judgment as to plaintiffs' argument that the Town illegally discriminated against plaintiffs by restricting their access to Seagull Drive.

In addition, plaintiffs contend that the Town denied only plaintiffs building permits and threatened only plaintiffs with demolition, and therefore did not enforce the Ordinance 16-31(6) against other beachfront properties allegedly located in the public trust area. See Pls.' Mem. Opp'n

Def.'s Mot. Summ. J. 31–32. The Town's evidence shows that the Cottages were not the only Nags Head properties subject to a nuisance declaration. See Ogburn Aff. ¶ 5; Ogburn Dep. 286–88; cf. Sansotta Dep. 265. The Town has issued twenty-two nuisance declarations since the November Storm; and, excluding plaintiffs and one other property owner, all of the owners have complied with the declarations. Ogburn Dep. ¶ 5. In fact, Sansotta himself admitted that he was aware that the Town demolished a nearby beachfront house, and stated that he did not think that the Town had specifically targeted the Cottages. See Sansotta Dep. 265–66. Nevertheless, Ogburn did acknowledge that the Town did not issue nuisance declarations to fourteen beachfront properties located partially or wholly in the pubic trust area. Ogburn Dep. 286–88. Accordingly, there is evidence that the Town treated plaintiffs differently from other similarly situated property owners.

"[W]hen no fundamental right or suspect classification is at issue, the Equal Protection Clause allows a legislative body wide latitude in drawing classifications. Social or economic legislation 'will be sustained if the classification drawn . . . is rationally related to a legitimate state interest.'" Tri Cnty. Paving, 281 F.3d at 438 (quoting City of Cleburne, 473 U.S. at 440) (omission in original); see Chambers Med. Tech. of S.C., Inc. v. Bryant, 52 F.3d 1252, 1262–63 (4th Cir. 1995). Ogburn stated that the Town decided whether to declare a property a nuisance based on the degree to which the property obstructed the beach. See Ogburn Dep. 289–90; Ogburn Aff. ¶ 5. Plaintiffs argue that the Town's declaring as nuisances beach-obstructing properties is not rationally related to any legitimate governmental interest. See Pls.' Opp'n Def.'s Mot. Summ. J. 32.

In determining whether the interests underlying the decision to issue nuisance declarations are legitimate, "substantial judicial deference is required . . . ." Sylvia, 48 F.3d at 820. The court "will not substitute its policy judgments as to the exercise of the police power for those of a democratically elected local government." Tri Cnty. Paving, 281 F.3d at 439; see Sylvia, 48 F.3d at 820. In issuing nuisance declarations, the Town sought to prevent "interfere[nce] with the public's right to use and enjoy the beach" and to allow "emergency service vehicles to travel and use the

21

beach." Ogburn Aff. ¶ 5; see Ogburn Dep. 248–50; Def.'s Mem. Supp. Mot. Summ. J. 32. The Town has a legitimate interest in ensuring emergency vehicles' unimpeded travel and a legitimate interest in the public's right to travel and use the beach. See, e.g., MacDonald v. City of Chi., 243 F.3d 1021, 1034 (7th Cir. 2001); V-1 Oil Co. v. Utah State Dep't of Pub. Safety, 131 F.3d 1415, 1426–27 (10th Cir. 1997); W. Washington Cnty. Emergency Med. Servs. v. Washington Cnty., 967 F.2d 1252, 1255 (8th Cir. 1992); see also Metro. Life Ins., 471 U.S. at 756. Therefore, the Town's objectives are legitimate governmental interests.[6]

Next, the court must determine whether the Town's action—declaring the Cottages nuisances—was rationally related to the Town's underlying objectives. The Town need only have reasonably believed that its action was rationally related to its objectives. See, e.g., Tri Cnty. Paving, 281 F.3d at 439; Front Royal, 135 F.3d at 290; Bryant, 52 F.3d at 1262–63. It was reasonable for the Town to believe that issuing the Nuisance Declaration was rationally related to the Town's objectives of preventing beach obstructions and safe travel for emergency vehicles. See Ogburn Aff. ¶ 4(C) (observing that "there have been times when the Cottages did restrict pedestrian access along the ocean beaches"); id. ¶ 7 (the Cottages are "located so closely to the Atlantic Ocean so as to restrict emergency and life saving vehicle travel"); id. ¶ 11 (stating that "swimmers [have been] located farther landward than the easternmost portion of the Cottages"); id. ¶ 12 ("vehicles used by

---

[6] In Cherry, the North Carolina Court of Appeals held that the Town could not enforce public trust rights against properties located in the public trust. 2012 WL 540742, at *6. The appellate court also rejected the Town's argument that enforcing a nuisance ordinance against a property located in the public trust is distinct from enforcing the public trust itself. See id. at *5. However, Cherry does not alter whether the Town's interests underlying the nuisance declarations are legitimate. Moreover, with respect to Cherry, the Town has fifteen days from the issuance of the appellate court's mandate to petition the Supreme Court of North Carolina for discretionary review and has stated its intent to seek discretionary review. See N.C. R. App. P. 15(b). The appellate court's mandate did not issue until twenty days after the opinion was filed (which was on February 21, 2011). Id. 32(b). Furthermore, upon petition for discretionary review, the Supreme Court of North Carolina will likely stay the mandate until it can determine whether review is warranted. See id. 23(b).

ocean rescue service . . . would not have been able to travel the beach in this area"); Ogburn Dep. 248–49 (discussing how the Cottages have prevented the ocean rescue service from patrolling the beach). Accordingly, although the Town may have declined to issue declarations to other properties that were wholly or partially located in the public trust area, the Town's targeting of the Cottages was "rationally related" to "legitimate state interest[s]." Tri Cnty. Paving, 281 F.3d at 438; Chambers Med. Tech., 52 F.3d at 1262. Thus, the court grants the Town's motion for summary judgment as to plaintiffs' request for declaratory relief for a violation of plaintiffs' equal protection rights.

D.

Plaintiffs also claim that the Town acted under color of state law to deprive plaintiffs of their rights secured by the Fifth and Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. § 1983. 2d Am. Compl. ¶¶ 183–87. The parties have filed cross-motions for summary judgment on this claim. See Def.'s Mot. Summ. J. 2; Pls.' Mot. Summ. J. 2.

To state a section 1983 claim, plaintiffs must show that the Town deprived him or her of a federal right and did so under color of state law. See Gomez v. Toledo, 446 U.S. 635, 640 (1980); Hall v. Quillen, 631 F.2d 1154, 1155–56 (4th Cir. 1980). A section 1983 claim fails as a matter of law when there is no underlying constitutional violation. See, e.g., Young v. City of Mount Ranier, 238 F.3d 567, 579 (4th Cir. 2001) ("The law is quite clear in this circuit that a section 1983 . . . claim cannot be maintained . . . where there is no underlying constitutional violation by the [government] employee."); Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999); S.P. v. City of Takoma Park, Md., 134 F.3d 260, 274 (4th Cir. 1998). Because plaintiffs have not established a violation of their Fifth or Fourteenth Amendment rights, plaintiffs' section 1983 claim fails.

E.

Plaintiffs seek compensation for the Town's alleged taking of the Cottages. However, plaintiffs cannot challenge the Town's action as an unconstitutional taking until after seeking and being denied compensation from the state. See, e.g., San Remo Hotel, L.P. v. City & Cnty. of S.F.,

23

545 U.S. 323, 338 (2005); Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 195 (1985); Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016, 1019–20 (1984); Holliday Amusement Co. of Charleston, Inc. v. South Carolina, 493 F.3d 404, 406–09 (4th Cir. 2007). At this time, plaintiffs' sole means of recovery for the alleged regulatory taking is an inverse condemnation action, see N.C. Gen. Stat. § 40A-51, which plaintiffs have initiated in their twelfth claim. Accordingly, plaintiffs' claim for just compensation is not ripe and the claim is dismissed.

IV.

Because the court grants summary judgment to the Town as to plaintiffs' federal claims, the court next considers whether to exercise supplemental jurisdiction over the remaining state-law claims. A court may decline to exercise supplemental jurisdiction over a state-law claim when (1) "the claim raises a novel or complex issue of State law," (2) "the claim substantially predominates over" over the federal claim or claims, (3) the court has "dismissed all claims over which it has original jurisdiction," or (4) other "exceptional circumstances" present "compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(1)–(4). Additionally, the court may decline to exercise supplemental jurisdiction when "principles of economy, convenience, fairness, and comity" make the court's retaining jurisdiction over the claims inappropriate. Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 351 (1988); see Hinson, 239 F.3d at 617.

The elimination of all federal claims before trial is generally a sufficient ground in itself for declining supplemental jurisdiction over pendent state-law claims. See Carnegie-Mellon, 484 U.S. at 350 n.7 ("[I]n the usual case in which all federal-law claims are eliminated before trial the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); Shanaghan, 58 F.3d at 110 ("Recent case law has emphasized that trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished."); see also Walsh v. Mitchell, 427 F. App'x 282, 283 (4th

24

Cir. 2011) (per curiam) (unpublished); <u>Root v. Cnty. of Fairfax</u>, 371 F. App'x 432, 435 (4th Cir. 2010) (per curiam) (unpublished). Therefore, eliminating the federal claims weighs heavily against exercising supplemental jurisdiction over the remaining state-law claims.

Additional reasons also support declining to exercise supplemental jurisdiction. At the heart of the state-law claims is the parties' contentious dispute about the definition, location, and applicability of the "public trust area." In addition, plaintiffs challenge a municipality's authority to enforce nuisance ordinances on North Carolina's ocean beaches. Furthermore, resolving the Town's counterclaims would require the court to determine whether plaintiffs' Cottages are nuisances under North Carolina law. The parties' filings and independent research provide little precedent to guide the court's resolution of these important and unsettled state-law issues. Yet, their resolution will likely affect other municipalities and state entities, North Carolina beachfront property owners, and visitors to the North Carolina coast. <u>Cf.</u> <u>Arrington v. City of Raleigh</u>, 369 F. App'x 420, 423 n.2 (4th Cir. 2010) (per curiam) (unpublished). Not only is there "a strong preference that state law issues be left to state courts in the absence of diversity or federal question jurisdiction . . . [,]" but in a case like this, which involves "important and potentially far-reaching" state-law issues, the court may very well abuse its discretion if it were to exercise supplemental jurisdiction over the remaining state-law claims. <u>See</u> <u>id.</u> at 422–24. Accordingly, this factor weighs heavily against exercising jurisdiction.

Finally, there are additional compelling reasons to decline jurisdiction over the state-law claims. <u>See</u> 28 U.S.C. 1367(c)(4). The remaining claims concern land-use regulations, and "state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical, and legal questions" surrounding such regulations. <u>San Remo</u>, 545 U.S. at 347; <u>see</u> <u>Gardner</u>, 969 F.2d at 67. Additionally, "federal courts should be extremely reluctant to upset the delicate political balance at play in local land-use disputes." <u>Shooting Point, L.L.C. v. Cumming</u>, 368 F.3d 379, 385 (4th Cir. 2004) (quotation omitted); <u>see</u> <u>Sylvia</u>, 48 F.3d at 828–29; <u>Gardner</u>, 969

25

F.2d at 68. Thus, "[t]here is no sanction for casual federal intervention into what has always been an intensely local area of the law." Gardner, 969 F.2d at 67 (quotation omitted).

In sum, the court declines to exercise supplemental jurisdiction over the remaining state-law claims. In doing so, the court may either dismiss the claims without prejudice or remand the claims to Dare County Superior Court. See Farlow v. Wachovia Bank of N.C., N.A., 259 F.3d 309, 316–17 (4th Cir. 2001); Hinson, 239 F.3d at 616; Shanaghan, 58 F.3d at 109. Because dismissal of the state-law claims would risk further delay of their resolution, see Carnegie-Mellon, 484 U.S. at 353, the court remands all unresolved claims to Dare County Superior Court.[7]

V.

As to plaintiff's seventh, eighth, ninth, and tenth claims, the court GRANTS in part the Town's motion for summary judgment [D.E. 81]. The court DISMISSES plaintiff's eleventh claim as unripe. The court declines to exercise supplemental jurisdiction over plaintiffs' nine remaining claims and the Town's four counterclaims, and REMANDS these claims and counterclaims (along with any other pending motions) to Dare County Superior Court.

SO ORDERED. This 28 day of March 2012.

JAMES C. DEVER III
Chief United States District Judge

---

[7] In Farlow, the Fourth Circuit instructed the district court that, if it "elect[ed] to remand the case to the state court, it should dismiss the counterclaim without prejudice prior to the remand so that [the defendant] may reassert the same in the state court should it be so advised." 259 F.3d at 317. This instruction appears to proscribe dismissal with prejudice of a counterclaim, but not proscribe remanding a counterclaim along with a state claim. Given the "principles of economy, convenience, fairness, and comity" at issue, Carnegie-Mellon Univ., 484 U.S. at 351, the court also remands all unresolved counterclaims.

Case 2:10-cv-00029-D   Document 137   Filed 03/28/12   Page 26 of 26